UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CATHY STEPHENS,

    Plaintiff,

                                        Case No. 07-11908

-vs-                                      Judge Avern Cohn

NEIGHBORHOOD SERVICE
ORGANIZATION,

    Defendant.

_____/

**MEMORANDUM AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

This is a case brought under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Plaintiff Cathy Stephens ("Stephens") was employed by defendant Neighborhood Service Organization ("NSO"), first as an administrative assistant and later as a "Training Specialist." On August 14, 2006, Stephens sought medical leave under the FMLA due to hypertension, stress, and anxiety. On or about October 6, 2006, while she was still on medical leave, Stephens sought benefits under the Michigan Workers' Disability Benefits Compensation Act ("WDBCA"), MCL § 418.101 *et seq*. Stephens attempted to return to work on November 2, 2006. Upon

1

returning, however, Stephens was told that her position was being eliminated and that her employment with NSO was therefore terminated.

Stephens brings entitlement and retaliation claims under the FMLA, 29 U.S.C. §§ 2615(a)(1)-(2), and a retaliation claim under the WDBCA, MCL § 418.301(11).  Now before the Court is NSO's motion for summary judgment.  For the reasons discussed below, there are genuine issues of material fact surrounding Stephens's claims, and NSO's motion will therefore be denied.

## II.  Factual Background

### A.  NSO and BHPI

NSO is a nonprofit social service agency that provides a wide range of social services, particularly mental health services.  For example, NSO offers services targeted at persons who suffer from mental illness, developmental disabilities, substance abuse, and gambling addiction.  NSO employs approximately 360 persons and, in addition, utilizes approximately 35 to 40 independent contractors.

Behavioral Health Professionals, Inc. ("BHPI") is an administrative services organization.  It owns the ConsumerLink and Carelink Networks, which are managed care provider networks for the Detroit-Wayne County Community Mental Health Agency.  ConsumerLink and CareLink hold contracts with the Detroit-Wayne County Community Mental Health Agency for the provision of mental health care services, and BHPI administers the contracts.  BHPI subcontracted with NSO to provide the state-required training for direct care service workers at adult group homes.

## B. Stephens's Employment

Stephens began work as an administrative assistant in NSO's Human Resources Department on November 1, 2004. In this position, Stephens reported to Patricia Verrill ("Verrill"), the Training Manager, and David Kozlowski ("Kozlowski"), the Human Resources Director. In approximately May 2005, Stephens began to teach classes occasionally in addition to her administrative duties.

In September 2005, Stephens was promoted to the newly-created position of "Training Specialist" and received a pay increase of about 15%, made retroactively effective to July 8, 2005. As part of the promotion, Stephens agreed to teach approximately 4.5 days per month. Stephens had a number of other responsibilities, including but not limited to registering participants for training sessions, keeping payment records in conjunction with the Accounting Department, developing and improving training programs, and answering the Training Department phones. Stephens says that about 80% of her duties were directly tied to training services. In her new position, Stephens reported exclusively to Verrill.

In April 2006, the Training Department added another employee, Markese McAdoo ("McAdoo"), to fill another newly-created position, Administrative Office Assistant. Thereafter the Training Department consisted of three employees: Verrill, Stephens, and McAdoo.

Apparently, Stephens began to experience problems in the workplace soon after assuming her new position as Training Specialist. Around the time she applied for disability benefits under the WDBCA, in October 2006, Stephens prepared a log listing the "hostile workplace incidents" she had experienced during her time at NSO. The log

3

states that in August 2005, Stephens "started to experience a change in [Verrill's] attitude and demeanor...It became a norm for her to come to the office and not acknowledge me with a Hello or make her presence know in anyway [sic]." Other employees agree that there appeared to be tension or problems between Verrill and Stephens. The log entries from around this time indicate that many employees were upset that Verrill typically worked only light hours, and the October/November 2005 entry states that this problem "eventually turned into a power struggle, corporate politics, alienation and me fearing for my job."

Stephens further stated in her log that by April 2006, she believed Verrill had begun campaigning to have her removed from her position as Training Specialist. Stephens again specifically stated that she "feared for [her] job." Around this time, Verrill went to the Chief Financial Officer, Amy O'Brien ("O'Brien"), and requested that she speak to Stephens in order to help resolve any personal problem that existed between Stephens and Verrill. O'Brien and Kozlowski met with Stephens, but according to O'Brien's affidavit, Stephens "did not disclose the root of any problem in her relationship with Verrill."

### C. The Change in BHPI Policy

Prior to 2005, BHPI paid NSO directly for the direct care training of ConsumerLink and CareLink employees. Between 2005 and July 2006, BHPI stopped paying NSO directly and began reimbursing the employees for the cost of training; because the employees had to pay the entire cost of the training up front before being reimbursed, enrollment in NSO's training programs declined to some degree. In July

2006, BHPI announced that, effective October 1, 2006, it would begin accepting an alternative training curriculum for its direct care staff that was much less expensive.

Stephens was responsible for direct care training, which provided most of the revenues generated by the Training Department: 83% of revenues in 2004-05.[1] Numerous people at NSO believed that this change in BHPI policy would result in reduced enrollment in the direct care training program. O'Brien and the Chief Operating Officer of NSO met with the CEO of BHPI on August 16, 2006, to attempt to persuade him to reconsider, but were unsuccessful.

When O'Brien drafted the Training Department budget for 2006-07, in early October 2006, she did not include a salary for a Training Specialist; that is, the draft budget contemplated that Stephens would be laid off. In her affidavit, O'Brien explains that, given the expectation of reduced enrollment, Verrill was capable of teaching all the Training Department classes herself. O'Brien decided to retain McAdoo to handle support duties, since her salary was less than Stephens's salary.

O'Brien says that she discussed the draft budget with Sheilah Clay ("Clay"), the CEO of NSO, in October. Clay agreed to lay off Stephens. Clay says that she did not consult with Verrill before making the decision. Further, Clay says that she and O'Brien decided not to take action until Stephens returned to work (Stephens was on FMLA leave throughout the month of October) so that Stephens's "benefits would not be interrupted."

---

[1] Unlike other departments at NSO, the primary purpose of the Training Department is to generate revenues for NSO. The Training Department pays for itself, while for the most part other departments rely on grants or contracts to provide client services.

O'Brien says that, as she and others expected, enrollment in the direct care training courses has declined substantially since BHPI announced that it would accept the less expensive training course.

### D. Stephens's Medical Leave

In early 2006, Stephens began seeking medical care for hypertension and stress. On August 14, 2006, she suffered an anxiety attack at work after someone threw a bottle at her while she walked from the parking lot into the building. She left work and went immediately to her doctor's office. A social worker recommended that Stephens take a medical leave of absence until September 20, 2006. The medical leave was extended several times, and Stephens did not attempt to return to work until November 2.

On or about October 6, while she was on leave from work, Stephens made a claim for disability benefits under the WDBCA. There appears to have been some confusion about the nature of the claim among NSO management, since the insurance forms indicated that the reason for the claim was a "chest injury." Management ultimately determined that "chest injury" referred to Stephens's hypertension, and there does not now appear to be any question about the propriety of the claim.

Stephens attempted to return to work on November 2. However, when she arrived she was prevented from using her computer due to a changed password. She was terminated that afternoon. At the time, she was told that the reason was "lack of funding." The termination letter, written by Kozlowski for Clay's signature, said that

Stephens was being laid off due to "economic necessity," the specific cause of which was BHPI's decision to accept the less expensive training program.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must

prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Analysis

### A. FMLA Entitlement Claim

Stephens first contends that she was entitled to be reinstated to her pre-leave position or an equivalent position when she returned to work and that NSO failed to reinstate her. To prevail on an entitlement claim, an employee must prove that: (1) she was an eligible employee, (2) defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. Edgar v. JAC Prods., 443 F.3d 501, 507 (6th Cir. 2006). The only element of the claim at issue here is the last: whether Stephens was entitled to return to her job or an equivalent position in light of NSO's proffered reason for her being laid off.

NSO first argues that Stephens was indeed restored to her position for some period of hours on November 2 before she was terminated at the end of that day.

8

However, 29 C.F.R. § 825.220 provides that "manipulation by a covered employer to avoid responsibilities under FMLA" is impermissible "interference" with an employee's FMLA rights, foreclosing this argument. See Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1288 (10th Cir. 2007) (finding on similar facts that restoration was illusory).

Although Stephens was not reinstated, NSO may still prevail if it can show (1) that Stephens's position would have been eliminated even if she had never taken FMLA leave; and (2) that it offered Stephens reinstatement in an equivalent position that she chose not to accept, or alternatively that there was no such alternative position available. Watkins v. J&S Oil Co., 164 F.3d 55, 59-60 (1st Cir. 1998). NSO argues that Stephens's entitlement claim fails because "interference with an employee's rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." Edgar, 443 F.3d at 508; see also Arban v. West Pub. Co., 345 F.3d 390, 401 (6th Cir. 2003) (employer may lawfully dismiss employee if the dismissal would have occurred regardless of the FMLA leave). The defendant bears the burden of demonstrating such a legitimate reason. 29 C.F.R. § 825.216(a)(1); Parker v. Hahneman Univ. Hosp., 234 F. Supp. 2d 478, 486-87 (D.N.J. 2002). The question at the summary judgment stage thus becomes whether there is a genuine issue of material fact as to whether Stephens's decision to avail herself of FMLA leave was a but-for cause of the decision to terminate her employment.

Importantly, an employer is liable under the entitlement theory if an employee is dismissed for reasons connected to her FMLA leave, even if the reason is not retaliation for the leave. Arban, 345 F.3d at 402. Here, Stephens suggests that NSO discovered that it could function effectively without her during the time she was on leave and

9

therefore decided to dismiss her. Stephens points to Verrill's deposition testimony on this point:

> A …The program functioned fine when Cathy was out on medical. Markese [McAdoo, the administrative assistant] picked up the…administrative functions that Cathy was handling. I picked up the teaching functions that Cathy was handling and we were able to do it with just the two of us in Cathy's absence.
> Q And so that's why – it worked well that way, so why change it when she was gone.
> A I'm just saying that we were able to do that without a third person in the department.
> Q And the reason you knew that was because she was out on medical and had been doing that.
> A The reason I knew it would work?
> Q Yes.
> A Yes.

The power of this evidence is diminished by the fact that Clay undisputedly made the decision to fire Stephens without directly consulting Verrill. However, O'Brien testified at her deposition that she discussed terminating Stephens with Verrill, and that Verrill told her that the Training Department could continue to function without Stephens. O'Brien later communicated the substance of these conversations to Clay. In such cases, it may be appropriate to impute Verrill's actions to Clay, the decisionmaker. See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 878 (6th Cir. 2001). Relying on this evidence, a reasonable factfinder could find that Stephens would not have been terminated if she continued working instead of taking FMLA leave. See Parker, 234 F. Supp. 2d at 490 (denying summary judgment on entitlement claim where some evidence indicated that employer had learned to function without plaintiff while she was on leave and therefore decided not to reinstate her).

Summary judgment on Stephens's entitlement claim is inappropriate for the additional reason that there are genuine issues of fact surrounding whether there were equivalent positions within NSO that she could have been offered instead of her old job as Training Specialist.  It is undisputed that no effort was made to place Stephens in a new position with NSO before she was terminated.  Stephens further points out that a majority of her duties were administrative or clerical in nature, and suggests that in an organization as large as NSO, some similar work would likely have been available.

NSO responds that its Vacancy Reports from October, November, and December 2006 show that there were no equivalent positions available at NSO at the time Stephens was terminated.  However, NSO admits that two positions for which Stephens was arguably qualified, Lead Data Entry and Administrative Office Assistant, were filled in mid to late October, after the decision to terminate Stephens had been made but before it had been carried out.  Viewing these facts in the light most favorable to Stephens, a jury could find that NSO decided to terminate Stephens but delayed the termination while it filled vacant, arguably equivalent positions within the organization, thus ensuring that no equivalent positions were available at the time that Stephens was actually terminated.  A defendant cannot avoid liability on an entitlement claim by manipulating its hiring practices in such a manner.  NSO's motion will therefore be denied as to the entitlement claim.

### B.  FMLA Retaliation Claim

Stephens also makes a retaliation claim under the FMLA.  29 U.S.C. § 2615(a)(2) provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made

unlawful by this subchapter." 29 C.F.R. § 825.220(c) further explains that "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example…employers cannot use the taking of FMLA leave as a negative factor in employment actions." "This prohibition includes retaliatory discharge for taking leave." Arban, 345 F.3d at 403.

As in other types of employment discrimination cases, the employer's motive is relevant, and the employer can defend its action based on a legitimate nondiscriminatory reason. Courts generally apply the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973). This analysis works in three steps. First, the plaintiff must present evidence sufficient to support a *prima facie* case of discrimination. To do so, the plaintiff must show (1) she availed herself of a protected right under the FMLA, (2) she was adversely affected by an employment decision, and (3) there is a causal connection between the exercise of the protected right and the adverse employment action. If the plaintiff can make out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason for the termination is pretextual. Edgar, 443 F.3d at 508.

Here, the first issue is whether Stephens has proffered evidence sufficient to create a genuine issue about the causal connection between her taking FMLA leave and being discharged. In addition to the evidence discussed above in the context of the entitlement claim, there is the fact that Stephens was fired the very day she attempted to return to work from her FMLA leave. This temporal proximity is "unduly suggestive"

12

and is sufficient to establish a *prima facie* case of discrimination even absent the other evidence. Parker, 234 F. Supp. 2d at 492 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir. 2000).

NSO has presented sufficient evidence of a legitimate, nondiscriminatory reason for Stephens's discharge: her services were no longer required because BHPI's change in policy was expected to result in decreased enrollment in direct care training programs. The burden thus shifts back to Stephens to raise a genuine issue of material fact as to whether this reason for her discharge was pretextual, i.e. that it was not the true reason for her discharge. The temporal proximity between her return from FMLA leave and her discharge is relevant here as well. Although "temporal proximity in and of itself is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual," Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 317 (6th Cir. 2001), it tends to indicate that this is so.

Stephens has also come forward with other evidence that creates questions about whether the BHPI decision was the true reason for her discharge. The tentative budget that O'Brien prepared in October 2006 eliminated Stephens's position, but included a newly-created, vacant position for a half-time trainer; this suggests that NSO management actually expected the Training Department's workload to be beyond the capacity of the two remaining employees. Verrill also received a pay increase of $15,000 per year, almost half of Stephens's yearly salary, in October 2006, further tending to undermine the contention that the Training Department was generating insufficient revenue to pay Stephens. Moreover, a new position for "Help Desk Administrator" was created within the Training Department in October 2006; McAdoo

13

says that the person who filled that position took on some responsibility for direct care service training. O'Brien also admitted in her deposition that while she expected the direct care training enrollment to decrease, it was still possible that the revenues generated by the Training Department would increase by up to $100,000 in fiscal year 2007. Finally, the fact that NSO did not consider reassigning Stephens to a new position also tends to suggest that the true reason for the dismissal was to get rid of Stephens, not to lay her off due to lack of need. For all these reasons, there are genuine issues of material fact as to whether the proffered reason for Stephens's firing was pretextual. Defendants' motion for summary judgment as to the retaliation claim will therefore be denied.

**C. WDBCA Claim**

MCL § 418.301(11) provides that an employer "shall not discharge an employee or in any manner discriminate against an employee…because of the exercise by the employee…of a right afforded by this act." "The burden is on the plaintiff to show that there was a causal connection between the protected activity, i.e. the filing of his worker's compensation claim, and the adverse employment action." Chiles v. Machine Shop, Inc., 606 N.W.2d 398, 404 (Mich. App. 1999).

For many of the same reasons discussed above, Stephens has come forward with evidence sufficient to create a genuine issue of material fact regarding a possible causal connection between her filing a disability benefits claim and her dismissal. The temporal proximity is again notable: the claim was filed on October 17, 2006, and Stephens was fired about two weeks later, on November 2.

14

NSO also fired Angela Pitts ("Pitts"), a Human Resources Generalist, in connection with Stephens's disability claim. Pitts testified at her deposition that management accused her of improperly filing the claim on Stephens's behalf. (Management also contacted the insurance carrier and expressed concern over the size of Stephens's claim.) Pitts forwarded information concerning the claim to her home computer and subsequently to Stephens in order to preserve a record of the action. NSO fired her, citing a breach of confidentiality and the terms of computer usage.

In addition, for the reasons stated above, there are genuine questions as to whether the proffered reason for Stephens's dismissal actually motivated the dismissal.

In Chiles, the Michigan Court of Appeals found that a jury verdict against the defendant employer rendered under the WDBCA on similar facts should not be overturned:

> On the basis of the timing of the layoff, evidence that cutbacks were not necessary, evidence that upper management inquired into the cost of plaintiff's workers' compensation benefits, and evidence of defendant's role in having the work restrictions lifted, it was reasonable for the jury to conclude that retaliation was a motive for laying off plaintiff and not recalling him.

Id. at 404-05. The same types of evidence are present here, and defendants' motion for summary judgment as to the WDBCA claim will be denied.

## V. Conclusion

For all the reasons stated above, there are genuine issues of material fact as to all three of Stephens's claims. Defendants' motion for summary judgment is therefore DENIED.

SO ORDERED.

       s/Avern Cohn
       AVERN COHN
       UNITED STATES DISTRICT JUDGE

Dated: August 19, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 19, 2008, by electronic and/or ordinary mail.

       s/Julie Owens
       Case Manager, (313) 234-5160